IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-1291 |
| | § | |
| VIKING RESOURCES, INC. and | § | |
| ROGER W. CHAMBERS, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court are Defendants', Viking Resources, Inc. ("Viking") and Roger W. Chambers, Joint Motion for Final Summary Judgment (Docket Entry No. 20), and Plaintiff United States' Motion for Summary Judgment (Docket Entry No. 22).[1] For the reasons stated below, the court will deny both motions.

---

[1] In support of their motions for summary judgment Viking and Chambers filed Defendants', Viking Resources, Inc. and Roger W. Chambers, Brief and Memorandum of Law in Support of Their Joint Motion for Final Summary Judgment (Docket Entry No. 21), and the United States filed Plaintiff United States' Memorandum in Support of Motion for Summary Judgment (Docket Entry No. 23). In response to the United States' motion, Chambers filed Defendant's, Roger W. Chambers, Response to Plaintiff's, United States of America, Motion for Summary Judgment and Memorandum in Support Thereof (Docket Entry No. 25), and Viking filed Defendant's, Viking Resources, Inc., Response to Plaintiff's, United States of America, Motion for Summary Judgment and Memorandum in Support Thereof (Docket Entry No. 26). In response to Chambers and Viking's motion, the United States filed United States' Response to Viking Resources, Inc. and Roger W. Chambers' Motion for Summary Judgment (Docket Entry No. 27).

Also pending before the court are Plaintiff United States' Motion to Correct a Material Inaccuracy in Defendant Viking Resources, Inc.'s Response to Plaintiff's Motion for Summary Judgment (Docket Entry No. 28),[2] which will be denied as moot, and Plaintiff United States' Motion to Strike Jury Demand of Defendants (Docket Entry No. 33),[3] which will be denied, and Defendants', Viking Resources, Inc. and Roger W. Chambers, Unopposed Motion to Bifurcate Trial (Docket Entry No. 35),[4] which will also be denied.

## I.  **Background**

On December 18, 2004, an oil spill ("the Highland Bayou spill") was reported to the Texas General Land Office ("TGLO"),

───────────────────

[2]In support of this motion the United States filed a Request in Support of U.S.' Motion to Correct a Material Inaccuracy in Defendant Viking Resources, Inc.'s Response to Plaintiff's Motion for Summary Judgment (Docket Entry No. 29).  Viking responded by filing Defendant Viking Resources, Inc.'s Response to the United States' Motion to Correct a Material Inaccuracy in Defendant Viking Resources, Inc.'s Response to Plaintiff's Motion for Summary Judgment (Docket Entry No. 31).

[3]In support of this motion the United States filed Plaintiff United States' Memorandum in Support of Motion to Strike Jury Demand of Defendants (Docket Entry No. 34).  In response Chambers and Viking filed Defendants', Viking Resources, Inc. and Roger W. Chambers, Joint Opposition to Government's Motion to Strike Defendants' Jury Demand (Docket Entry No. 42).  The government then filed Plaintiff United States' Reply to Defendants' Joint Opposition to Government's Motion to Strike Defendants' Jury Demand (Docket Entry No. 44).

[4]In support of this motion Viking and Chambers filed a Memorandum in Support of Defendants' Viking Resources, Inc. and Roger W. Chambers Unopposed Motion to Bifurcate Trial (Docket Entry No. 36).

which then notified the United States Coast Guard ("Coast Guard").[5]
The oil originated from a tank battery[6] ("old tank battery")
located on land overlying the Maco Stewart Lease[7] near Hitchcock,
Galveston County, Texas.[8]   The oil flowed into a wetland
immediately adjacent to Highland Bayou, a navigable tributary to
Galveston Bay.[9]

     The Coast Guard, with the assistance of the TGLO and the
National Oceanic and Atmospheric Administration ("NOAA"), conducted

_____

     [5]United States Environmental Protection Agency, Pollution
Report (Feb. 2, 2005) (included in Defendants', Viking Resources,
Inc. and Roger W. Chambers, Brief and Memorandum of Law in Support
of Their Joint Motion for Final Summary Judgment, Docket Entry
No. 21, at Exhibit 1).

     [6]A tank battery is a collection of tanks used to store liquids
-- in this case, oil.

     [7]The Maco Stewart Lease is an oil and gas lease originally
executed in 1946 by Maco Stewart and others, as lessors, and
Stewart's company, Stewart Petroleum Company, as lessee.
Defendants', Viking Resources, Inc. and Roger W. Chambers, Original
Answer to Plaintiff's Original Complaint and Request for Jury,
Docket Entry No. 8, at ¶ 2.  Over the years after its inception the
lease was subdivided horizontally and vertically, and portions of
the lease, such as the one involved in this suit, were assigned to
multiple lessees and operated by multiple parties.  Id. at ¶¶ 4-5.

     [8]Declaration of Jonathan Abramson, at ¶ 6 (included in
Plaintiff United States' Memorandum in Support of Motion for
Summary Judgment, Docket Entry No. 23, at Exhibit 1); Declaration
of Kristina Williams, at ¶ 8 (included in Plaintiff United States'
Memorandum in Support of Motion for Summary Judgment, Docket Entry
No. 23, at Exhibit 1).

     [9]Declaration of Jonathan Abramson, at ¶ 6 (included in
Plaintiff United States' Memorandum in Support of Motion for
Summary Judgment, Docket Entry No. 23, at Exhibit 1); Declaration
of Kristina Williams, at ¶ 8 (included in Plaintiff United States'
Memorandum in Support of Motion for Summary Judgment, Docket Entry
No. 23, at Exhibit 2).

water cleanup operations.[10]   The United States Environmental Protection Agency ("EPA"), assisted by the Texas Railroad Commission ("TRRC"), carried out land-based removal operations.[11] All oil removal operations were completed by January 13, 2005.[12] According to the United States, removal crews recovered approximately 225 barrels (9,450 gallons) of oil from the land, water, and wetlands, combined.[13]

The government contends that the oil removal operations associated with the Highland Bayou spill cost $376,262.96.[14] Additionally, after negotiation, TGLO and the Coast Guard agreed that the spill caused $271,179.82 in natural resource damages.[15]

---

[10]Declaration of Jonathan Abramson, at ¶ 6 (included in Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 1).

[11]Id.

[12]Id.

[13]Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at 3-4.

[14]Declaration of Jonathan Abramson, at ¶¶ 7-10 (included in Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 1).

[15]See Declaration of Kristina Williams, at ¶¶ 6-8, 10-13 (included in Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 2). Although Williams states in her affidavit that the total natural resource damages are $271,180.19, the components of the total -- $230,495.82 for future damages, $6,110.00 for past damages, and $34,574.00 for "unforseen" future damages -- add up to $271,179.82. See id. at ¶¶ 10-13.  The United States, therefore, asserts total natural resource damages of $271,179.82 in its summary judgment motion.   See Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at 4.

The Coast Guard has paid or will pay all removal costs and natural resource damages from the Oil Spill Liability Trust Fund ("OSLTF"),[16] a federal government fund created pursuant to 26 U.S.C. § 9509 for, among other things, the payment of removal costs and damages incurred as a result of certain oil discharges specified by the Oil Pollution Act ("OPA").   See 26 U.S.C. § 9509(c)(1)(A).

The OPA also provides that the United States may recover from "each responsible party . . . removal costs and damages" associated with oil discharges "into or upon the navigable waters or adjoining shorelines . . . ."  33 U.S.C. § 2702(a).  Therefore, the Coast Guard conducted a record search to attempt to identify responsible parties for the Highland Bayou spill.[17]

Viking was the last known lessee and operator of a subdivided portion of the Maco Stewart Lease underlying the land where the old tank battery was located.[18]   Chambers is the president, sole

---

[16]Declaration of Jonathan Abramson, at ¶ 11 (included in Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 1); see Declaration of Kristina Williams, at ¶¶ 2, 7, 13 (included in Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 2).

[17]See Declaration of Kristina Williams, at ¶ 9 (included in Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 2).

[18]See Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at 6; Oral Deposition of Robert Wesley Chambers (November 5, 2008), at Exhibit 16 (included in Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 3).

officer, sole director, and sole owner of Viking.[19]  Viking became
the registered operator of the relevant subdivided portion of the
Maco Stewart Lease on October 1, 1995,[20] and obtained ownership of
that portion of the lease by assignment from Seabrook Energy, Inc.
("Seabrook") on July 19, 1996.[21]  Viking last produced oil or gas
from the lease sometime in 2001.[22]

On April 28, 2008, the United States filed this action against
Viking and Chambers under 33 U.S.C. § 2702.[23]  The United States
asserts that Viking and/or Chambers are strictly liable as
"responsible part[ies]" for cleanup costs and damages incurred as
a result of the Highland Bayou spill.  33 U.S.C. § 2702(a).

## II.   Cross-Motions for Summary Judgment

### A.   Summary Judgment Standard

Summary judgment is warranted if the movant establishes that
there is no genuine dispute about any material fact and that it is

---

[19]See Oral Deposition of Robert Wesley Chambers (November 5,
2008), at 22-27, Exhibit 3 (included in Plaintiff United States'
Memorandum in Support of Motion for Summary Judgment, Docket Entry
No. 23, at Exhibit 3).  Although several documents submitted to the
TRRC during the course of Viking's ownership and operation of the
lease list other officers, Chambers testified that they had no real
authority or responsibilities as officers of the company.  Id. at
21-27.

[20]Id. at 61, Exhibit 12.

[21]Id. at 11-12.   See also Assignment of Oil and Gas Lease
(July 19, 1996) (included in Defendants', Viking Resources, Inc.
and Roger W. Chambers, Brief and Memorandum of Law in Support of
Their Joint Motion for Final Summary Judgment, Docket Entry No. 21,
at Exhibit 4).

[22]Id. at 123.

[23]See Complaint, Docket Entry No. 1.

-6-

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).
An examination of substantive law determines which facts are
material.  Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510
(1986).  Material facts are those facts that "might affect the
outcome of the suit under the governing law."  Id.  A genuine issue
as to a material fact exists if the evidence is such that a
reasonable trier of fact could resolve the dispute in the nonmoving
party's favor.  Id. at 2511.

     Where, as here, both parties have moved for summary judgment,
both "motions must be considered separately, as each movant bears
the burden of establishing that no genuine issue of material fact
exists and that it is entitled to judgment as a matter of law."
Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-39
(5th Cir. 2004).  The movant must inform the court of the basis for
summary judgment and identify relevant excerpts from pleadings,
depositions, answers to interrogatories, admissions, or affidavits
that demonstrate there are no genuine fact issues.  Celotex Corp.,
106 S. Ct. at 2553; see also Wallace v. Tex. Tech Univ., 80 F.3d
1042, 1046-47 (5th Cir. 1996).  If a defendant moves for summary
judgment on the basis of an affirmative defense, "it must establish
beyond dispute all of the defense's essential elements."  Bank of
Louisiana v. Aetna U.S. Healthcare Inc., 468 F.3d 237, 241 (5th
Cir. 2006).  A defendant may also meet its initial burden by
pointing out that the plaintiff has failed to make a showing
adequate to establish the existence of an issue of material fact as

to an essential element of his case.  Celotex Corp., 106 S. Ct. at 2552.   If the movant satisfies its initial burden, the burden shifts to the nonmoving party to show by affidavits, depositions, answers to interrogatories, admissions on file, or other evidence that summary judgment is not warranted because genuine fact issues exist.  Celotex Corp., 106 S. Ct. at 2552.

In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Products Inc., 120 S. Ct. 2097, 2110 (2000). But conclusory claims, unsubstantiated assertions, or insufficient evidence will not satisfy the nonmovant's burden.  Wallace, 80 F.3d at 1047.   If the nonmovant fails to present specific evidence showing there is a genuine issue for trial, summary judgment is appropriate.  Topalian v. Ehrman, 954 F.2d 1125, 1132 (5th Cir. 1992).

**B.   Elements for Strict Liability Under OPA**

To ensure that oil spills are quickly and efficiently cleaned up, victims are compensated, and costs are internalized within the oil industry, "the OPA imposes strict liability on parties responsible for the discharge of oil . . . ."  Rice v. Harken Exploration Co., 250 F.3d 264, 266 (5th Cir. 2001).  To demonstrate that a party is strictly liable, the government must prove that (1) the defendant is a "responsible party" (2) for the "facility"

-8-

or "vessel" (3) from which oil was discharged, or from which there was a substantial threat of discharge, (4) "into or upon the navigable waters or adjoining shorelines" and (5) that the discharge resulted in "removal costs and damages."   33 U.S.C. § 2702(a); see also United States v. Jones, 267 F. Supp. 2d 1349, 1353 (M.D. Ga. 2003) (listing elements for liability under § 2702).

The United States contends that it is entitled to summary judgment because there are no genuine issues of material fact as to any of these elements.  Viking and Chambers assert that they are entitled to summary judgment because the government has failed to produce enough evidence to even create a fact issue as to whether they are responsible parties.  Although they do not contend that the discharge in question did not come from a facility, Viking and Chambers also take issue with the government's broad characteriza-tion of the facility in this case.  With regard to removal costs and damages, Viking and Chambers challenge the affidavits upon which the government relies to prove the asserted amounts, and contend that the government has failed to show it is entitled to summary judgment on this issue.  Viking and Chambers do not challenge the government's assertion that the Highland Bayou spill involved a discharge of oil into navigable waters.

The court will first consider whether the government's definition of the facility is appropriate under the OPA.  Then it will decide whether either party has established that no genuine issue of material fact exists as to whether Viking and/or Chambers

are responsible parties for the facility.  Lastly, the court will address cleanup costs and damages.

1.   Facility

The OPA defines "facility" as:

> any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil. This term includes any motor vehicle, rolling stock, or pipeline used for one or more of these purposes.[24]

33 U.S.C. § 2701(9).  The Highland Bayou spill originated from the old tank battery, which was located on the surface overlying Viking's oil and gas lease.[25]  The parties and the court agree that the old tank battery meets the statutory definition of "facility." The government, however, asserts that the "facility" for this case

_____

[24]Because OPA litigants usually agree as to what constitutes the facility for a particular case, see, e.g., United States v. Burlington Res. Oil & Gas Co., No. 2:05CV-1395, 2007 WL 773716, at *1 (W.D. La. March 9, 2007); United States v. Jones, 267 F. Supp. 2d 1349, 1353-54 (M.D. Ga. 2003); United States v. Bois D' Arc Operating Corp., No. 98-157, 1999 WL 130635, at *3 (E.D. La. March 10, 1999), there is virtually no applicable case law elaborating on this definition.  The court was able to locate only one case in which the definition of "facility" was discussed in any detail, but it is not helpful in this case.  See United States v. S. Pac. Transp. Co., No. 94-6176-HO, 1995 WL 84193, at *2 (D. Or. Feb. 20, 1995) (holding that a locomotive fuel tank does not constitute a "facility" because it was not "used for the commercial production or transportation of diesel fuel").

[25]The old tank battery was removed shortly after the spill. United States Environmental Protection Agency, Pollution Report (Feb. 2, 2005) (included in Defendants', Viking Resources, Inc. and Roger W. Chambers, Brief and Memorandum of Law in Support of Their Joint Motion for Final Summary Judgment, Docket Entry No. 21, at Exhibit 1).

should be defined more broadly to include more than just the old tank battery.

The government contends that the applicable facility in this case consists of all oil-related equipment and structures located within the geographic boundaries of Viking's lease,[26] i.e.: "four wells, known and numbered as Wells 31, 33, 35, and 36, two tank batteries, known hereinafter as the 'Old Tank Battery' and the 'New Tank Battery,' [and] piping and other equipment used in conjunction with oil or gas production."[27]  If the statutory definition of "facility" -- which clearly allows for a facility to consist of multiple structures and pieces of equipment -- is considered in isolation, the government's methodology for defining the facility seems plausible.  But when viewed in light of OPA's definition for "responsible party," problems emerge.  See Dolan v. Postal Service, 126 S. Ct. 1252, 1257 (2006) ("The definition of words in isolation, however, is not necessarily controlling in statutory

---

[26]Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at 4 ("The geographic boundaries of the Facility coincides with those conferred in the Partial Lease Assignment to Viking on July 19, 1996."); id. at 17 (asserting that Well 33 and Well 35 are part of the facility because "those items were located within the area leased by Viking (Facility)"); United States' Response to Viking Resources, Inc. and Roger W. Chambers' Motion for Summary Judgment, Docket Entry No. 27, at 3 ("[A]ll of the structures, equipment, and devices existing on and within the geographic boundaries of Defendants' leased area . . . at the time of the Highland Bayou Spill collectively constitute a 'facility' under the relevant provisions of OPA.").

[27]Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at 4-5.

construction . . . . Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.").

For the purposes of defining "responsible party," the OPA distinguishes between onshore facilities[28] and offshore facilities.[29] For onshore facilities "any person _owning_ or _operating_ the facility" is a responsible party. 33 U.S.C. § 2701(32)(B) (emphasis added). On the other hand, for offshore facilities the OPA provides that "the lessee . . . permittee . . . or the holder of a right of use and easement . . . for the _area_ in which the facility is located" is the responsible party. 33 U.S.C. § 2701(32)(C) (emphasis added).[30]

The parties agree that the facility in this case, whatever components it may consist of, is an "onshore facility." Nevertheless, the government essentially treats the facility as if

---

[28]An "onshore facility" is "any facility . . . of any kind located in, on, or under, any land within the United States other than submerged land." 33 U.S.C. § 2701(24).

[29]An "offshore facility" is "any facility of any kind located in, on, or under any of the navigable waters of the United States, and any facility of any kind which is subject to the jurisdiction of the United States and is located in, on, or under any other waters, other than a vessel or a public vessel." 33 U.S.C. § 2701(22).

[30]For abandoned onshore and offshore facilities, "the persons who would have been responsible parties immediately prior to the abandonment of the vessel or facility" are responsible parties. 33 U.S.C. § 2701(32)(F).

it were an offshore facility by relying solely on geography to identify a responsible party, albeit indirectly through its asserted definition of the facility. Such an approach conflicts with Congress' clear choice not to use area as a criterion for defining responsible parties for onshore facilities.

Moreover, the government's methodology undermines Congress' intent to make ownership and operation the touchstones of liability for onshore facilities. See 32 U.S.C. § 2701(32)(B). As the court will explain, under the government's methodology for defining a facility, a party could be strictly liable for discharges from an onshore structure or piece of equipment that it never owned and never operated.

Over its long history, Viking's lease was held by multiple, prior lessees.[31]  Viking's lease only extended to a particular depth; other lessees held the rights to the minerals located at greater depths beneath the same surface area.[32]  It is therefore quite possible that oil-related structures and equipment could have been present on the surface within the boundaries of Viking's lease that were never owned or operated by Viking and/or that were never even associated with its lease.  Under the government's

_____

[31]See Defendants', Viking Resources, Inc. and Roger W. Chambers, Original Answer to Plaintiff's Original Complaint and Request for Jury, Docket Entry No. 8, at ¶¶ 4-5.

[32]See Assignment of Oil and Gas Lease (July 19, 1996) (included in Defendants', Viking Resources, Inc. and Roger W. Chambers, Brief and Memorandum of Law in Support of Their Joint Motion for Final Summary Judgment, Docket Entry No. 21, at Exhibit 4).

methodology, such equipment would nevertheless be components of a single, aggregate "facility," and Viking could be a responsible party for such equipment simply because Viking was the lessee of a portion of the underlying minerals and/or owned or operated at least one member component of the aggregate, geographically defined facility.

Such an outcome is not compatible with Congress' emphasis on operation and ownership for onshore facilities.  The government must prove that Viking and/or Chambers owned or operated the old tank battery itself.  It may not circumvent this burden by inappropriately expanding the scope of the "facility" based solely on geography.

Accordingly, the court declines to adopt the government's overly-broad definition of the "facility" for this case.  The old tank battery, the undisputed source of the oil discharge in question, satisfied the definition of a facility at the time of the spill -- it was a structure, group of structures, equipment or device that was used, at the very least, for storing oil.  See 33 U.S.C. § 2701(9).

2.  Responsible Party

The OPA defines "responsible party" differently for different types of facilities.  The parties agree that the oil discharge in this case originated from an onshore facility.  For onshore facilities, "any person owning or operating the facility" is a

-14-

responsible  party.    33  U.S.C.  §  2701(32)(B).[33]    The  OPA  also

provides  that  for  <u>abandoned</u>  onshore  facilities,  "the  persons  who

would  have  been  responsible  parties  immediately  prior  to  the

abandonment  of  the  .  .  .  facility"  are  responsible  parties.    33

U.S.C.  §  2701(32)(F).    The  last  party  or  parties  to  own  or  operate

an  abandoned  facility  before  it  was  abandoned  is  thus  a  responsible

party  for  that  facility.    See  33  U.S.C.  §§  2701(32)(C),(F).

As  explained  above,  the  government  cannot  rely  on  an  overly

broad  definition  of  the  facility  to  show  that  Viking  and/or

Chambers  are  responsible  parties  by  virtue  of  the  fact  that  it/they

unquestionably  owned  and  operated  the  lease  underlying  the  old  tank

battery  or  other  equipment  or  structures  on  the  lease  premises.

Instead,  the  government  must  show  that  Viking  and/or  Chambers  owned

or  operated  the  old  tank  battery  itself.

a.    Viking  and  Chambers'  Summary  Judgment  Motion

The  court  first  considers  Viking  and  Chambers'  summary

judgment  motion  with  respect  to  the  responsible  party  issue.    See

Shaw  Constructors,  395  F.3d  at  538-39  (explaining  that  the  court

must  consider  cross-motions  for  summary  judgment  separately).    The

court  "must  disregard  all  evidence  favorable  to  [Viking  and

Chambers]  that  the  jury  is  not  required  to  believe,"  Great  Atl.  &

Pac.  Tea  Co.,  233  F.3d  at  329,  and  must  "draw  all  reasonable

---

[33]The  definition  provides  an  exception  for  certain  government
entities,  which  is  not  pertinent  in  this  case.

inferences in favor of the [government] . . . ."  <u>Sanderson Plumbing Products</u>, 120 S. Ct. at 2110.

Viking and Chambers assert that they are entitled to summary judgment because neither of them ever owned or operated the old tank battery and that the government, as the party with the burden of proof on this issue, has presented insufficient evidence to even create a fact issue as to whether either of them ever owned or operated the old tank battery.[34] The court will address Viking and Chambers separately.

_____

[34]For the purposes of their joint summary judgment motion, Viking and Chambers assume that the old tank battery was abandoned at the time of the spill. See Defendants', Viking Resources, Inc. and Roger W. Chambers, Brief and Memorandum of Law in Support of Their Joint Motion for Final Summary Judgment, Docket Entry No. 21, at 1, 2, 4 n.2, 6, 14 (characterizing consistently the old tank battery as abandoned); Affidavit of Roger Chambers (June 27, 2007), at ¶ 8 (stating that the old tank battery was abandoned) (included in Defendants', Viking Resources, Inc. and Roger W. Chambers, Brief and Memorandum of Law in Support of Their Joint Motion for Final Summary Judgment, Docket Entry No. 21, at Exhibit 10). The government does not contend otherwise in its response.  Assuming that the old tank battery was abandoned at the time of the spill, the definition of "responsible party" found in 33 U.S.C. § 2701(32)(F) governs.  Under that definition Viking and Chambers would be responsible parties if they owned or operated the old tank battery "immediately before [its] abandonment . . . ." 33 U.S.C. § 2701(32)(F).  Viking and Chambers, however, argue only that the government has presented insufficient evidence to create a fact issue as to whether either of them <u>ever</u> owned or operated the old tank battery.  They do not argue that, even if they did own or operate the old tank battery at some point in the past, the government has failed to present sufficient evidence to create a fact issue as to whether they owned or operated the old tank battery <u>immediately prior to its abandonment</u>.  Because Viking and Chambers, as the moving parties, bear the initial burden to show the court why they are entitled to judgment as a matter of law, but did not raise this argument, the court need not consider it.  <u>See</u> <u>Shaw Constructors</u>, 395 F.3d at 538-39.

(continued...)

### i.   Viking as an Owner or Operator

The government asserts that Viking obtained ownership of the old tank battery through the same assignment by which it obtained the oil and gas lease.  The OPA provides virtually no guidance as to what constitutes ownership under the statute, circularly defining the term "owner" for an onshore facility as "any person owning . . . such facility."  33 U.S.C. § 2701(26)(A)(ii).  The court, therefore, evaluates whether Viking owned the tank by looking to state law.  See United States v. Burlington Res. Oil & Gas Co., No. 2:05CV-1395, 2007 WL 773716, at *1 (W.D. La. March 9, 2007) (looking to state law to determine whether the defendant owned the facility); United States v. La. Land & Exploration Co., No. 03-3208, 2006 WL 851183, at *3 (E.D. La. March 17, 2006) (same).

Under Texas property law surface equipment used for the production, exploration, and production of oil and gas is considered personal property.  McCormick v. Krueger, 593 S.W.2d 729, 731 (Tex. Civ. App. -- Houston [1st Dist.] 1979, writ ref'd n.r.e.).  Therefore, determining whether Viking obtained ownership of the old tank battery through the assignment is a matter of interpreting the assignment.

---

[34](...continued)
The court acknowledges that, for purposes of the United States' summary judgment motion, Viking does not concede that the old tank battery was abandoned.  See Defendant's, Viking Resources, Inc., Response to Plaintiff's, United States of America, Motion for Summary Judgment and Memorandum in Support Thereof, Docket Entry No. 26, at 5-6.

The assignment states that Seabrook "assign[s] and convey[s] to [Viking] all of [Seabrook's] right, title and interest in the Lease (and the Property) . . . ."[35]  Under Texas law assignments are interpreted by applying the same rules used for interpreting contracts.  See First City Nat'l Bank of Midland v. Concord Oil Co., 808 S.W.2d 133, 136-137 (Tex. App. -- El Paso 1991, no writ) (applying contract interpretation rules to interpret an assignment of two oil and gas leases); see also 55A Tex. Jur. 3d Oil & Gas § 369 (2004) ("Rules of construction similar to those governing the construction and effect of contracts to assign oil and gas leases are applied to the assignment itself.").  Under Texas contract law "the court must recognize that the parties to a writing will not include a clause in the writing unless they intend it to have some effect."  Praeger v. Wilson, 721 S.W.2d 597, 601 (Tex. App. -- Fort Worth 1986, writ ref'd n.r.e.).  Therefore, in order to give effect to every clause in the assignment, the court must presume that the assignment transferred not only "the Lease," but also "the Property."

The assignment clearly defines the term "Lease" in a lengthy paragraph under the title "Identity of Lease."  The parties to the assignment used the term "Lease" to refer only to the pertinent

---

[35]Assignment of Oil and Gas Lease (July 19, 1996) (included in Defendants', Viking Resources, Inc. and Roger W. Chambers, Brief and Memorandum of Law in Support of Their Joint Motion for Final Summary Judgment, Docket Entry No. 21, at Exhibit 4).

subdivided portion of the Maco Stewart oil and gas lease -- an interest in real property. The description of the "Lease" in the assignment does not include any personal property. The assignment, however, does not define the term "Property."

Determining whether a contract is ambiguous is a question of law for the court to decide. R & P Enters. v. LaGuardia, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518 (Tex. 1980). The court may conclude that the contract is ambiguous only if, after applying the general rules of contract interpretation, the meaning of the instrument remains "genuinely uncertain." Id. at 519.

After "examin[ing] and consider[ing] the entire instrument," id., the court concludes that the term "Property" is ambiguous. There are no clues within the four corners of the document as to what Seabrook was transferring to Viking in addition to the oil and gas lease. Nevertheless, the court must assume that it referred to something "so that none of the provisions will be rendered meaningless." Id.

Because the court has concluded that the assignment language is ambiguous, it may examine extraneous evidence to determine the true intentions of the parties. Id. Looking to extraneous evidence, Chambers admitted in his deposition that Viking obtained some oil and gas production equipment with the lease. Specifically, Chambers stated that several new, uninstalled tanks -- which were later installed and comprised the "new tank battery"

-19-

-- "came with the lease."[36]  This strongly suggests that the term "Property" in the assignment referred to oil production and handling equipment present on the lease premises, including the new tanks and possibly the old tank battery.

Other circumstances further support a reasonable inference that the ambiguous term "Property" included the old tank battery. Uncontroverted TRRC records indicate that some oil was being produced from the lease each month at the time Viking acquired it in July of 1996.[37]  Moreover, Chambers admits that Texas law requires that all oil produced must flow through a tank battery

_____

[36]Oral Deposition of Robert Wesley Chambers (November 5, 2008), at 10 (included in Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 3) ("[The new tank battery] came with my lease.").  In an affidavit included with Viking's response to the government's motion for summary judgment, Chambers subtly changed his characterization of how Viking obtained the new tanks.  He averred: "At the time [Viking] acquired the Lease from [Seabrook], an agreement had been made with the owner of some oil storage tanks to use his tanks in a battery on the Maco Stewart Lease in exchange for a share of the production."  Affidavit of Roger Chambers (Dec. 8, 2008), at ¶ 1 (included in Defendant's, Viking Resources, Inc., Response to Plaintiff's, United States of America, Motion for Summary Judgment and Memorandum in Support Thereof, Docket Entry No. 26, at Exhibit A).  This description of Viking's acquisition of the new tanks is ambiguous, not clearly stating whether Viking obtained the tanks in the same transaction in which it obtained the lease or a separate transaction.  Viewing the evidence in the light most favorable to the government, the court assumes that Chambers still admits that Viking obtained ownership of the new tanks via the same assignment by which it obtained the lease.

[37]See Oral Deposition of Robert Wesley Chambers (November 5, 2008), at Exhibit 16 (included in Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 3).

before it can be sold,[38] and he asserts that Viking complied with
these regulations.[39] Yet, Chambers testified at his deposition that
the new tank battery was not installed and ready for use when
Viking obtained the lease.[40]   He further testified in his
deposition,[41] and stated in an affidavit, that the new tanks were
not installed until the following year, 1997.[42]   Furthermore, the
government obtained affidavits from two contractors who stated that
the new tank battery was installed in 2000, approximately <u>four</u>
<u>years</u> after Viking obtained the lease.[43]   Finally, Chambers stated

---

[38]<u>See</u> Tex. Nat. Res. Code Ann. § 88.054 (Vernon 2001) ("No
person owning, leasing, operating, or controlling an oil property
may permit oil produced by him in this state to pass from his
possession or control to the possession or control of any other
person except from a tank or tanks under the control of the person
producing the oil.")

[39]Defendant's, Roger W. Chambers, Response to Plaintiff's,
United States of America, Motion for Summary Judgment and
Memorandum in Support Thereof, Docket Entry No. 25, at 11.

[40]Oral Deposition of Robert Wesley Chambers (November 5, 2008),
at 10 (included in Plaintiff United States' Memorandum in Support
of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 3).

[41]<u>Id.</u> at 45.

[42]Affidavit of Roger Chambers (June 27, 2007), at ¶ 11
(included in Defendants', Viking Resources, Inc. and Roger W.
Chambers, Brief and Memorandum of Law in Support of Their Joint
Motion for Final Summary Judgment, Docket Entry No. 21, at
Exhibit 10).

[43]Affidavit of Houston Martin (Nov. 13, 2008), at ¶¶ 5-6
(included in Plaintiff United States' Memorandum in Support of
Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 4);
Affidavit of Eddie Murray (Nov. 13, 2008), at ¶ 3 (included in
Plaintiff United States' Memorandum in Support of Motion for
Summary Judgment, Docket Entry No. 23, at Exhibit 5).

that, to his knowledge, there were never any other tank batteries on the premises other than the new and old tank batteries.[44]

All of this suggests that the old tank battery must have been utilized to store the oil that was being produced at the time of the assignment of the lease to Viking, and for some time thereafter, until the new tank battery was installed.   Therefore, a reasonable trier of fact could find that Viking and Seabrook intended that the old tank battery be conveyed to Viking along with the oil and gas lease and other personal property, and thus, that Viking owned the old tank battery.   Accordingly, Viking has failed to show that it is entitled to summary judgment on this ground.[45] See Liberty Lobby, 106 S. Ct. at 2510 (explaining that summary judgment is not appropriate if the evidence in the record is such that a reasonable jury could decide a material fact issue in favor of the nonmoving party).

### ii.   Chambers as an Owner or Operator

As for Chambers, the government asserts that he was an owner or operator of the old tank battery under either of two independent

---

[44]Oral Deposition of Robert Wesley Chambers (November 5, 2008), at 8-9 (included in Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 3).

[45]Because the OPA does not require that a party be both an owner and an operator to be a responsible party, see 33 U.S.C. § 2701(32)(B) ("owning or operating") (emphasis added), the court need not address whether there is sufficient evidence to create an issue of fact as to whether Viking was an operator.

theories.  The government first contends that Chambers, who was the sole shareholder, officer, and director of Viking, abused Viking's corporate form and was the alter-ego of Viking such that Viking's corporate veil should be pierced, thereby derivatively making Chambers a responsible party by virtue of Viking's status as a responsible party.  See United States v. Bestfoods, 118 S. Ct. 1876, 1881, 1885-86 (1998) (holding that a parent company may be liable under CERCLA for its subsidiary's actions if the subsidiary's corporate veil may be pierced); Jones, 267 F. Supp. 2d at 1354 (relying on Bestfoods to hold that an individual officer and shareholder of a corporation could be derivatively designated a responsible party under OPA if the corporate veil could be pierced).[46]  The government also asserts that Chambers personally managed, directed, and conducted the workings of the old tank battery such that he is an "operator" in his individual capacity.

---

[46]The court agrees that the principle of corporate veil piercing can be applied under OPA for all the same reasons cited by the Court in Bestfoods for applying it under CERCLA.  See Bestfoods, 118 S. Ct. at 188-86.  Although Bestfoods involved piercing the corporate veil of a subsidiary in order to hold the parent corporation derivatively liable, federal courts have held that the veil piercing analysis also applies to determine whether an individual shareholder or officer of a corporation could be derivatively liable under CERCLA.  See, e.g., Carter-Jones Lumber Co. v. Dixie Distributing Co., 166 F.3d 840, 846 (6th Cir. 1999) ("Here, using Bestfoods, Denune can be liable [under CERCLA] due to his status as the sole shareholder of Dixie if Ohio law would allow the piercing of the corporate veil . . . ."); Sensient Colors, Inc. v. Kohnstamm, 548 F. Supp. 2d 681, 688 (D. Minn. 2008) (holding that plaintiff had stated a viable claim by asserting that individual shareholder defendants could be held liable under CERCLA by piercing the corporate veil).

See Bestfoods, 118 S. Ct. at 1886 (holding that "any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution" under CERCLA (emphasis added)); Jones, 267 F. Supp. 2d at 1355-56 (applying the Bestfoods "operator" analysis to hold that an individual officer and shareholder of a corporation was, as a matter of law, an operator of a facility, and thus a responsible party, under OPA).[47]

The Fifth Circuit has held that the analysis set forth in United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 691 (5th Cir. 1985), should be applied in CERCLA cases to determine whether the corporate veil should be pierced.[48] Joslyn Mfg. Co. v. T.L. James &

------------------------------------

[47]Because CERCLA's definition of "operator" for an onshore facility is virtually identical to OPA's definition of "operator" for an onshore facility, compare 33 U.S.C. § 2701(26)(A)(ii) ("any person . . . operating such facility"), with 42 U.S.C. § 9601(20)(A)(ii) ("any person . . . operating such facility"), the court concludes that the Bestfoods "operator" analysis applies in OPA cases involving onshore facilities. See also Harris v. Oil Reclaiming Co., 94 F. Supp. 2d 1210, 1213 (D. Kan. 2000) (applying the Bestfoods "operator" analysis to determine whether an individual corporate officer was a responsible party under "OPA"). But cf. Green Atlas Shipping SA v. United States, 306 F. Supp. 2d 974, 980-81 (D. Or. 2003) (concluding that "the simple application of the CERCLA operator jurisprudence is not appropriate" in deciding whether a captain of a vessel is an "operator" of the vessel under OPA because of OPA's financial responsibility provisions that apply to vessels). The court notes that OPA's financial responsibility provisions apply only to vessels and offshore facilities, and do not apply to onshore facilities. See 33 U.S.C. § 2716. Therefore, the reasoning of the Green Atlas Shipping court is not persuasive with regard to onshore facilities. See Green Atlas Shipping, 306 F. Supp. 2d at 980-81.

[48]The Supreme Court pointed out in Bestfoods that federal courts disagree as to whether state law or federal common law
(continued...)

Co., Inc., 893 F.2d 80, 83 (5th Cir. 1990).   Because of the similarity of CERCLA and the OPA, the court concludes that it is appropriate to apply it in this case.

As the Jon-T Chemicals court explained, the corporate veil can be pierced in two situations:   (1) if the corporation "is established for a fraudulent purpose or is used to commit an illegal act," or (2) if the corporation is merely the "alter-ego" of the parent corporation, or as in this case, the sole shareholder.   Jon-T Chemicals, 768 F.2d at 691.   The government relies on the second prong in this case, asserting that Viking is the alter-ego of Chambers.

In Jon-T Chemicals the Fifth Circuit listed a number of factors that courts should consider when conducting an alter-ego analysis.   Id.   Several of these factors are not applicable in this case or must be adjusted slightly because Jon-T Chemicals involved piercing the veil of a subsidiary corporation to reach the parent company.   See id.   For this case, the court should consider whether:

---

49(...continued)
governs an alter-ego analysis under CERCLA.   Bestfoods, 118 S. Ct. at 1885 n.9.   The Fifth Circuit has apparently not taken a position on the issue.   The Jon-T Chemicals court declined to state whether the alter-ego analysis prescribed in that case was derived from federal common law or state law "since the federal and state alter-ego tests are essentially the same," and because the federal and Texas alter-ego tests "overlap at least with regard to the principles involved in the present case."   Jon-T Chemicals, 768 F.2d at 690 n.6.

(1)   Chambers owns substantially all of the stock of Viking;

(2)   Chambers is the only director and/or officer of Viking;

(3)   Chambers finances Viking;

(4)   Chambers caused the incorporation of Viking;

(5)   Viking operates with grossly inadequate capital;

(6)   Chambers pays the salaries and other expenses of Viking;

(7)   Viking receives business only through and by Chambers;

(8)   Chambers uses Viking's property as his own;

(9)   Chambers and Viking's affairs are not kept separate;

(10)   Viking fails to observe the basic corporate formalities, such as keeping books and records and holding shareholder and board meetings.

See id. at 691-92.  The first two factors, alone, are not a sufficient basis for piercing the veil.  See id. at 691.

In the record before the court there is at least some evidence of many of these factors.  Chambers stated in his deposition that he was the sole owner, officer, and director of Viking.[49]  Chambers also testified that he provided all of the financing for Viking, except that his brother made a one-time investment of about

_____

[49]Oral Deposition of Robert Wesley Chambers (November 5, 2008), at 21-27 (included in Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 3).  Although several documents submitted to the TRRC listed others as officers or directors, Chambers stated that they had no real authority or responsibilities.  See id.

-26-

$50,000.[50]   Chambers is listed as the sole incorporator for Viking on the articles of incorporation filed with the Texas Secretary of State.[51]   Chambers stated in his deposition that Viking currently has no assets, and that the only substantial asset it ever held was the Maco Steward Lease.[52]   Chambers stated that he was the only person that was ever authorized to conduct banking activities for Viking.[53]   He also admitted that he used Viking's checking account to pay multiple personal expenses, including his personal American Express card bill.[54]   Lastly, Chambers stated that he did not often carry out corporate formalities for Viking, and that even when he did, he often did not maintain records to document them.[55]

The government has presented sufficient evidence to raise genuine fact issues as to the relevant factors that must be considered in deciding whether Viking's corporate veil should be pierced as to Chambers.   Therefore, because there is also a fact issue as to whether Viking owned the old tank battery, summary judgment for Chambers is not appropriate.[56]

---

[50]Id. at 22-23.

[51]See Articles of Incorporation of Viking Resources, Inc. (included in Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 7).

[52]Id. at 21, 26.

[53]Id. at 31.

[54]Id. at 29-30.

[55]Id. at 35-36.

[56]The court need not also consider whether the government has presented sufficient evidence to create a fact issue as to whether
(continued...)

                    b.  The Government's Summary Judgment Motion

     The government, which bears the burden of proof on this issue,
has not produced overwhelming or incontrovertible evidence that
Viking and Chambers owned or operated the old tank battery.
Instead, as discussed above, the evidence suggesting that Viking
and/or Chambers owned or operated the old tank battery is largely
circumstantial and inferential.   Further, the record includes
deposition testimony and sworn affidavits from Chambers stating
that neither he nor Viking ever owned, operated, utilized, or
benefitted from the old tank battery.[57]  Because Viking and Chambers
are the nonmovants, the court must "give credence to evidence
favoring" them.  <u>Thomas v. Great Atl. & Pac. Tea Co.</u>, 233 F.3d 326,
329 (5th Cir. 2000).  The government, therefore, has failed to show
that there are no genuine issues of material fact as to whether
Viking and/or Chambers are responsible parties for the old tank
battery, and it is not entitled to summary judgment.

_____

     [56](...continued)
Chambers "operated" the old tank battery in his individual
capacity.

     [57]Affidavit of Roger Chambers (June 27, 2007), at ¶¶ 2, 8, 14
(included in Defendants', Viking Resources, Inc. and Roger W.
Chambers, Brief and Memorandum of Law in Support of Their Joint
Motion for Final Summary Judgment, Docket Entry No. 21, at
Exhibit 10); Oral Deposition of Robert Wesley Chambers (November 5,
2008), at 10 (included in Plaintiff United States' Memorandum in
Support of Motion for Summary Judgment, Docket Entry No. 23, at
Exhibit 3).

                                -28-

3.   Removal Costs and Damages

The OPA provides that a responsible party is liable for "removal costs and damages . . . ."   33 U.S.C. § 2702(a).   The courts have interpreted removal costs to include virtually any costs incurred in association with a cleanup operation, so long as the government does not act arbitrarily or capriciously.   See United States v. Hyundai Merchant Marine, Co., 172 F.3d 1187, 1191 (9th Cir. 1999).  Recoverable damages include "[d]amages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage . . . ."  33 U.S.C. § 2702(b)(2)(A).

The government contends that it is entitled to summary judgment on removal costs and damages.  To prove removal costs the government offers the affidavit of Jonathan Abramson, an employee of the Coast Guard's Case Management Division.[58]  Abramson served as the Regional Manager overseeing the Case Officer who managed the response to the Highland Bayou spill.[59]  Abramson averred that total removal costs incurred equaled $367,262.96.[60]  To prove natural resource damages the government offers the affidavit of Kristina Williams, an employee of the Natural Resource Damages Claims

---

[58]See Declaration of Jonathan Abramson (included in Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 1).

[59]Id. at ¶ 5.

[60]Id. at ¶¶ 8-10.

Division of the Coast Guard.[61]  She averred that the TGLO and the Coast Guard have agreed that total natural resources damages resulting from the Highland Bayou spill total $271,179.82.[62]

Federal Rule of Civil Procedure 56(e)(1) provides that "[a] supporting . . . affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e)(1).  The rule also provides that "[i]f a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit." Id.

Among their many objections to Abramson's affidavit, Chambers and Viking assert that Abramson has failed to provide the data underlying his averments.  Indeed, Abramson states that he obtained the total removal cost by reviewing "cost documentation," as well as the "case file, and associated documents."[63]  Sworn or certified

---

[61]See Declaration of Kristina Williams (included in Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 2).

[62]Id. at ¶¶ 6-8, 10-13.  Although Williams states in her affidavit that the total damages are $271,180.19, the components of the total -- $230,495.82 for future damages, $6,110.00 for past damages, and $34,574.00 for "unforseen" future -- add up to $271.179.82.  See id. at ¶¶ 10-13.  The United States, therefore, asserts total natural resource damages of $271,179.82 in its summary judgment motion.  See Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at 4.

[63]Declaration of Jonathan Abramson, at ¶ 7 (included in Plaintiff United States' Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 23, at Exhibit 1).

copies of these documents were not included with Abramson's affidavit as required by Rule 56(e)(1). Accordingly, Abramson's affidavit is insufficient to support summary judgment.

With regard to Williams' affidavit, Chambers and Viking similarly object that, among other things, she has failed to provide the data underlying her averments. Williams explains that the total amount of natural resource damages stated in her affidavit is derived from a settlement agreement reached between the TGLO and the Coast Guard. Yet, she has failed to provide a sworn copy of the settlement agreement, nor has she even begun to explain the basis for the TGLO and Coast Guard's damage determination. The affidavit, therefore, fails to comply with Rule 56(e)(1) and is insufficient to support summary judgment.

## C.   Viking and Chambers' Affirmative Defenses

Viking and Chambers also contend that they are entitled to summary judgment based on the affirmative defenses of release, collateral estoppel, and/or res judicata. Specifically, they assert that an agreed final judgment and/or a release of judgment associated with prior litigation between them and the State of Texas foreclose any recovery in this suit on behalf of the State of Texas.

On December 2, 2003, the State of Texas filed suit against Viking and Chambers in the District Court of Travis County, Texas.[64]

---

[64]Plaintiff's Original Petition, State of Texas v. Viking Resources, Inc., No. GV304693 (Tex. Dist. Ct. Travis County Dec. 2, (continued...)

The state sought an injunction against, as well as administrative and civil penalties from, Viking and Chambers for their failure to comply with TRRC orders.[65]   The State alleged that the TRRC had ordered Viking and Chambers to plug their wells on the Maco Stewart Lease because they had abandoned their operations there, but that Viking and Chambers had failed to comply.[66]

The state district court entered an Agreed Final Order on September 29, 2004, directing Viking and Chambers to, among other things, pay civil and administrative penalties and enjoining them to "plug or otherwise place in compliance with 16 Tex. Admin. Code § 3.14 (West 1999)" wells number 33, 35, and 36 by August 31, 2005.[67]   The court further enjoined Viking and Chambers to "plug only in compliance with 16 Tex. Admin. Code § 3.14 (West 1999)" well number 31 by August 31, 2005.[68]   On January 26, 2005, the state

_____

[64](...continued)
2003) (included in Defendants', Viking Resources, Inc. and Roger W. Chambers, Brief and Memorandum of Law in Support of Their Joint Motion for Final Summary Judgment, Docket Entry No. 21, at Exhibit 6).

[65]Id.

[66]Id.

[67]Agreed Final Order, State of Texas v. Viking Resources, Inc., No. GV304693 (Tex. Dist. Ct. Travis County Sept. 29, 2004) (included in Defendants', Viking Resources, Inc. and Roger W. Chambers, Brief and Memorandum of Law in Support of Their Joint Motion for Final Summary Judgment, Docket Entry No. 21, at Exhibit 7).

[68]Id.   The referenced regulation, 16 Texas Administrative Code § 3.14, deals solely with the plugging of wells over which the TRRC has jurisdiction.   See 16 Tex. Admin. Code § 3.14 (West 1999).

executed and filed a Release of Judgment stating that "[Viking and Chambers] have now fully satisfied their liability in connection with this case," and "releas[ing] the Judgment as paid in full."[69]

1.   Res Judicata

Under the doctrine of res judicata, a plaintiff who obtains a judgment against a defendant "may seek no further relief on that claim in a separate action."  Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc., 575 F.2d 530, 535 (5th Cir. 1978) (emphasis added).  The preclusive effect of the judgment "extends to the litigation of all issues relevant to the same claim between the same parties, whether or not raised at trial."  Id.

Viking and Chambers have failed to show that res judicata bars this action.  The United States was not a party to the state court action referenced by Viking and Chambers.  Moreover, this action does not involve the same claims or issues relevant to the claims asserted in the referenced state court action.  The state court action involved Viking and Chambers' alleged failure to plug wells on its lease as it was required to do under Texas law.  It was completely unrelated to the Highland Bayou spill or Viking and Chambers' potential liability under the OPA.

_____

[69]Release of Judgment, State of Texas v. Viking Resources, Inc., No. GV304693 (Tex. Dist. Ct. Travis County Jan. 26, 2005) (included in Defendants', Viking Resources, Inc. and Roger W. Chambers, Brief and Memorandum of Law in Support of Their Joint Motion for Final Summary Judgment, Docket Entry No. 21, at Exhibit 7).

2.    Collateral Estoppel

The doctrine of collateral estoppel precludes "the relitigation of issues actually adjudicated, and essential to the judgment, in a prior litigation between the same parties." Kaspar Wire Works, 575 F.2d at 535-36.   Chambers and Viking have failed to show that this doctrine bars this action.   The United States was not a party to the referenced state court action.   Moreover, the issues presented in this action -- an action for recovery of removal costs and damages arising from the Highland Bayou spill under the OPA – were not actually adjudicated in the state court action, which involved Viking and Chambers' failure to comply with state laws regarding the plugging of abandoned wells.

3.    Release

The affirmative defense of release also fails.   The release executed by the state released Viking and Chambers for their liability under the judgment rendered in the state court action.   As already explained, that action did not involve Viking and Chambers' potential liability under the OPA arising from the Highland Bayou spill.   Therefore, a release from the judgment in that case cannot be construed as a release from liability under the OPA, which may be established in this action.

III.   **United States' Motion to Correct a Material Inaccuracy**

In its response to the government's summary judgment motion, Viking represented that it had "asked for the manifests for the

-34-

transportation of the substance [removed from the spill site],
ha[d] asked for the name of the facility where it was disposed of,
and ha[d] asked for all tests conducted on the substance, in
addition to a sample of sufficient size to test."[70]  Viking further
asserted that if the substance turned out not to be crude oil, then
the government would not have a case against Viking or Chambers.[71]

The United States filed a motion to correct what it
characterized as a material inaccuracy in the aforementioned
representations made by Viking.[72]  The government asserted that it
had, in fact, not received a request for manifests for the

---

[70]Defendant's, Viking Resources, Inc., Response to Plaintiff's,
United States of America, Motion for Summary Judgment and
Memorandum in Support Thereof, Docket Entry No. 26, at 15.

[71]Id.  The court notes that this assertion is not quite
correct.  The United States must show that a discharge of "oil"
occurred.  33 U.S.C. § 2702(a).  The OPA defines "oil" as:

> oil of any kind or in any form, including petroleum, fuel
> oil, sludge, oil refuse, and oil mixed with wastes other
> than dredged spoil, but does not include any substance
> which is specifically listed or designated as a hazardous
> substance under subparagraphs (A) through (F) of section
> 101(14) of the Comprehensive Environmental Response,
> Compensation, and Liability Act (42 U.S.C. 9601) and
> which is subject to the provisions of that Act [42
> U.S.C.A. § 9601 et seq.]

33 U.S.C. § 2701(23).  Although the substance discharged must meet
this definition, it need not be crude as Viking suggests.

[72]Plaintiff United States' Motion to Correct a Material
Inaccuracy in Defendant Viking Resources, Inc.'s Response to
Plaintiff's Motion for Summary Judgment, Docket Entry No. 28; see
also Request in Support of U.S.' Motion to Correct a Material
Inaccuracy in Defendant Viking Resources, Inc.'s Response to
Plaintiff's Motion for Summary Judgment, Docket Entry No. 29.

transportation of the substance or the name of the disposal facility.

The court will deny this motion as moot. Viking did not assert that the government was not entitled to summary judgment -- or conversely, that Viking was entitled to summary judgment -- because the government had failed to provide the information that was allegedly requested. Therefore, the truth or falsity of the representation made by Viking was not dispositive and did not factor into the court's analysis of the parties' cross-motions for summary judgment.

### IV.   United States' Motion to Strike Jury Demand

Viking and Chambers requested a jury trial in their original answer pursuant to Federal Rule of Civil Procedure 38(b).[73]  The United States has filed a Motion to Strike Jury Demand of Defendants pursuant to Federal Rule of Civil Procedure 39(a)(2), asserting that Viking and Chambers are not entitled to a jury trial in this case.[74]

A party in a civil case has a right to a trial by jury only if an applicable statute so provides or the Seventh Amendment to the

---

[73]Defendants', Viking Resources, Inc. and Roger W. Chambers, Original Answer to Plaintiff's Original Complaint and Request for Jury, Docket Entry No. 8, at ¶ 3.

[74]Plaintiff United States' Motion to Strike Jury Demand of Defendants, Docket Entry No. 33; see also Plaintiff United States' Memorandum in Support of Motion to Strike Jury Demand of Defendants, Docket Entry No. 34.

United States Constitution applies and guarantees the right in the particular case.  Morgan v. Ameritech, 26 F. Supp. 2d 1087, 1090 (C.D. Ill. 1998); see Fed. R. Civ. P. 38(a) ("The right of trial by jury as declared by the Seventh Amendment to the Constitution -- or as preserved by a federal statute -- is preserved to the parties inviolate.").  Because "the OPA does not create a statutory right to a trial by jury," Viking and Chambers are entitled to a jury trial only if the Seventh Amendment's limited right to trial by jury applies in this case.[75]  South Port Marine, LLC v. Gulf Oil Ltd., 234 F.3d 58, 62 (1st Cir. 2000).

The Seventh Amendment provides:  "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."  U.S. Const. amend. VII (emphasis added).  The Supreme Court has explained that this amendment not only preserves the right to a jury trial as it existed at the time of the ratification of the amendment in 1791, but also "appl[ies] to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law."  Curtis v. Loether, 94 S. Ct. 1005, 1008 (1974) (emphasis added).  "In contrast, those actions that are analogous to 18th-century cases tried in courts of equity or admiralty do not require a jury trial."  Tull v. United States, 107

---

[75]The parties agree that the OPA does not provide a statutory right to a jury trial.

-37-

S. Ct. 1831, 1835 (1987).  To determine whether the right to a jury
exists for a particular statutory cause of action, the court must
(1) "compare the statutory action to 18th-century actions brought
in the courts of England prior to the merger of the courts of law
and equity," and (2) "examine the remedy sought and determine
whether it is legal or equitable in nature."  Id. at 1835.  The
second prong of the analysis is more important than the first.
Granfinanciera, S.A. v. Nordberg, 109 S. Ct. 2782, 2790 (1989).

In this case, the United States brings a statutory, strict
liability claim under the OPA.  It seeks two separate remedies --
removal costs and natural resource damages -- for the same
compensable event.  The fact that the statute allows and the
government seeks multiple remedies may complicate the two-step
analysis described above, particularly if one remedy is found to be
legal and one is found to be equitable.  Nevertheless, the court
must endeavor to determine whether Viking and Chambers have a right
to a jury trial, and if so, to what extent.  Mindful of the
principles that "[t]he Seventh Amendment question depends on the
nature of the issue to be tried rather than the character of the
overall action," Ross v. Bernhard, 90 S. Ct. 733, 738 (1970)
(emphasis added), and that "[w]hen legal and equitable issues are
merged in a single case, the trial court's discretion 'is very
narrowly limited and must, wherever possible, be exercised to
preserve jury trial,'" United States v. Williams, 441 F.2d 637, 644
(5th Cir. 1971) (quoting Beacon Theatres, Inc. v. Westover, 79

-38-

S. Ct. 948, 956 (1959)), the court will analyze the two remedies sought by the government separately.

## A.   Removal Costs

The OPA provides that responsible parties for facilities from which oil is discharged into navigable waters are liable for "removal costs," among other things.  33 U.S.C. § 2702(a).  The OPA defines removal costs as "all removal costs incurred by the United States, a State, or an Indian Tribe" as authorized by certain federal statutes "or under State law," or "any removal costs incurred by any person for acts taken by the person which are consistent with the National Contingency Plan."  33 U.S.C. § 2702(b)(1).

The court's research reveals that no federal court has yet decided whether a right to a jury trial arises in an action for removal costs under the OPA.  Many courts, however, have considered whether a right to a jury trial arises in comparable actions for response costs under CERCLA.  These courts have consistently held that the right does not arise in such cases because response costs are essentially a form of restitution, which is an equitable remedy.[76]  See, e.g., Hatco Corp. v. W.R. Grace & Co. Conn., 59 F.3d 400, 412 (3d Cir. 1995) (holding that "a jury trial is not

_____

[76]As the court notes below, restitution is not always an equitable remedy, and these courts may not have adequately considered the "fine distinction between restitution at law and restitution at equity . . . ."  Great-West Life & Annuity Ins. v. Knudson, 122 S. Ct. 708, 715 (2002).

available in a claim brought under section 9607 [to recover response costs]"); <u>United States v. Ne. Pharm. & Chem. Co.</u>, 810 F.2d 726, 749 (8th Cir. 1986) (holding that recovery of response costs under CERCLA is an equitable remedy, so there is no right to a jury trial); <u>United States v. Lang</u>, 870 F. Supp. 722, 723 (E.D. Tex. 1994) (holding that no right to a jury trial arose in an action to recover response costs under CERCLA).[77]

Under CERCLA owners and operators of facilities are liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe" as well as "any other necessary costs of response incurred by any other person . . . ." 42 U.S.C. §§ 9607(a)(1), (4)(A)-(B). Because of the similarity of the CERCLA response cost remedy, courts interpreting

---

[77]<u>See also, e.g.</u>, <u>Cal. Dept. of Toxic Substance Control v. Alco Pac., Inc.</u>, 217 F. Supp. 2d 1028, 1046-47 (C.D. Cal. 2002); <u>Thaler v. PRB Metal Products, Inc.</u>, 810 F. Supp. 49, 50 (E.D.N.Y. 1993); <u>United States v. Atlas Minerals and Chemicals, Inc.</u>, 797 F. Supp. 411, 422 n.24 (E.D. Pa. 1992); <u>Tri-County Bus. Campus Joint Venture v. Clow Corp.</u>, 792 F. Supp. 984, 997 (E.D. Pa. 1992); <u>Mid Valley Bank v. North Valley Bank</u>, 764 F. Supp. 1377, 1390 (E.D. Cal. 1991); <u>Bolin v. Cessna Aircraft Co.</u>, 759 F. Supp. 692, 716 n.31 (D. Kan. 1991); <u>GL Indus. of Mich., Inc. v. Forstmann-Little</u>, 800 F. Supp. 695, 698-99 (S.D. Ind. 1991); <u>United States v. Mexico Feed & Seed Co.</u>, 729 F. Supp. 1250, 1254 (E.D. Mo. 1990); <u>Wehner v. Syntex Corp.</u>, 682 F. Supp. 39, 40 (N.D. Cal. 1987); <u>United States v. Dickerson</u>, 640 F. Supp. 448, 453 (D. Md. 1986); <u>United States v. Ward</u>, 618 F. Supp. 884, 913 (E.D.N.C. 1985); <u>United States v. Mottolo</u>, 605 F. Supp. 898, 912-13 (D.N.H. 1985); <u>United States v. Wade</u>, 653 F. Supp. 11, 13 (E.D. Pa. 1984). Considering this extensive and virtually unanimous body of case law, one commentator characterized any assertion by a party in a CERCLA response cost recovery case that it was entitled to a jury trial as "frivolous," and "a purely dilatory tactic." <u>Developments in the Law--Toxic Waste Litigation</u>, 99 Harv. L. Rev. 1484, 1492 & n.47 (1986).

OPA's removal cost provisions have looked to CERCLA response cost jurisprudence for guidance.   See, e.g., Apex Oil Co. v. United States, 208 F. Supp. 2d 642, 653 (E.D. La. 2002) ("The close analogy to the OPA found in cost recovery actions under section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, . . . cannot be ignored."); Int'l Marine Carriers v. Oil Spill Liability Trust Fund, 903 F. Supp. 1097, 1103 (S.D. Tex. 1994) ("A close analogy is found in cost recovery actions under section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.A. § 9607, . . . ."). Moreover, relying on CERCLA jurisprudence, at least one court in this district has held that a suit for the recovery of removal costs under OPA constitutes an equitable action, although not in the context of deciding whether a right to a jury trial arises in such actions. See Int'l Marine Carriers, 903 F. Supp. at 1102-03 (concluding that a suit for recovery of removal costs under OPA was equitable in nature).   In light of this "avalanche of authority,"[78] as the government characterizes it, the court concludes that the recovery of removal costs under OPA constitutes an equitable remedy, and therefore, that Viking and Chambers are not entitled to a jury trial on the basis of this remedy.[79]

_____

[78]Plaintiff United States' Memorandum in Support of Motion to Strike Jury Demand of Defendant, Docket Entry No. 34, at 7.

[79]The court, however, acknowledges that the conventional wisdom as to the nature of the response cost remedy is open to question,
(continued...)

## B.   Natural Resource Damages

The OPA also provides that responsible parties for facilities from which oil is discharged into navigable waters are liable for damages, see 33 U.S.C. § 2702(a), including "damages for injury to, destruction of, loss of, or loss of use of, natural resources, including reasonable costs of assessing the damage . . . ."  33 U.S.C. § 2702(b)(2)(A).  Such damages are calculated by adding (1) "the cost of restoring, rehabilitating, replacing, or acquiring the equivalent of, the damaged natural resources," (2) "the diminution in value of those natural resources pending restoration," and (3) "the reasonable cost of assessing those damages."  33 U.S.C. § 2706(d)(1).  The OPA defines "natural

---

[79](...continued)
particularly in light of the Supreme Court's opinion in Great-West Life & Annuity Ins. v. Knudson, 122 S. Ct. 708 (2002).  In Knudson the Court pointed out that "not all relief falling under the rubric of restitution is available in equity."  Knudson, 122 S. Ct. at 714.  Accordingly, parties and courts must be mindful of the "fine distinction between restitution at law and restitution at equity . . . ."  Id. at 715.  But as Judge Brody recently noted in United States v. Sunoco, Inc., 501 F. Supp. 2d 641, 652 n.14 (E.D. Pa. 2007), the courts that have held that response cost recovery under CERCLA is an equitable remedy may have failed to do so; instead, they seem to have "assumed that cost recovery is equitable simply because it involves restitution . . . ."  Upon further examination, Judge Brody concluded that response cost recovery is most analogous to "quasi-contract" or "contract implied in law," see Sunoco, 501 F. Supp. 2d at 649, a restitutional remedy that developed in the English law courts in actions for assumpsit.  See 1 Dan B. Dobbs, Law of Remedies § 4.2(3), at 579-581 (2d ed. 1993).  Moreover, Dobbs states that response costs under CERCLA "are analogous to repair costs and consequential damages that a private landowner-plaintiff might recover in similar situations," and thus "closely resemble familiar common law types of damages."  Id. at § 5.2(5), at 727.

resources" as resources including "land, fish, biota, air, water, ground water, [and] drinking water supplies . . . belonging to, managed by, held in trust by, appertaining to, or otherwise February 11, 2009 controlled by the United States . . . any State or local government or Indian tribe, or any foreign government."   33 U.S.C. § 2701(20).

The court's research suggests that no court has determined whether recovery of natural resource damages under OPA constitutes a legal or equitable remedy or triggers a right to a jury trial. Courts have considered these issues, however, with regard to similar natural resource damages under CERCLA.[80]  See In re Acushnet River & New Bedford Harbor, 712 F. Supp. 994, 999-1001 (D. Mass. 1989); United States v. Wade, 653 F. Supp. 11, 13 (E.D. Pa. 1984). Because of the similarity of the two statutory schemes, the court finds these cases instructive.[81]

---

[80]CERCLA provides for the recovery of "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss . . . ." 42 U.S.C. § 9607(a)(4)(C). The statute similarly limits the scope of compensable resources to those "belonging to, managed by, controlled by or appertaining to" the United States, states, or Indian tribes. Id. at § 9607(f)(1). Any amounts recovered under CERCLA as natural resource damages may be used "only to restore, replace, or acquire the equivalent of such natural resources," but the measure of natural resource damages "shall not be limited by the sum which can be used to restore or replace such resources." Id.

[81]As discussed above, courts interpreting OPA's removal cost provisions, which are comparable to CERCLA's response cost provision, have similarly looked to CERCLA jurisprudence for
(continued...)

In Wade the plaintiff sought to recover as natural resource damages funds spent "in assessing any injury to natural resources or rehabilitating or restoring injured resources." Wade, 653 F. Supp. at 13. The court summarily concluded that this relief was equitable "for the same reasons that recovery of . . . response costs is considered equitable relief," and therefore, that the defendant had no right to a jury trial. Id. The court had concluded that response costs were equitable in nature because they were "in the nature of restitution." Id.

Five years later, another district court revisited the nature of CERCLA natural resource damages. See In re Acushnet River, 712 F. Supp. at 999-1001. After conducting a more detailed and thoughtful analysis, the court concluded that natural resource damages are not equitable in nature, but instead are essentially equivalent to money damages recoverable in tort for injury to property under a nuisance or trespass theory -- "precisely the type [of damages] a common law court could award." Id. at 1000. The court, however, refused to consider the recovery of costs expended to restore, replace, or rehabilitate natural resources as natural

---

[81](...continued)
guidance. See, e.g., Apex Oil Co., 208 F. Supp. 2d at 653 ("The close analogy to the OPA found in cost recovery actions under section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, . . . cannot be ignored."); Int'l Marine Carriers, 903 F. Supp. at 1103 ("A close analogy is found in cost recovery actions under section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.A. § 9607, . . . .").

resource damages.  See id. at 999.  The court viewed those expenses as response costs.  Id.  It narrowly defined natural resource damages only as "the value of the resources that are forever lost . . .; the lost use of such resources over time; and the costs of assessing how much is lost forever or how much lost use over time there has been . . . ."  Id.

Natural resource damages under OPA cannot be so narrowly defined since the statute explicitly provides that the costs of restoring, rehabilitating, replacing, or acquiring the equivalent of damaged resources are to be included in the measure of such damages.  See 33 U.S.C. § 2706(d)(1)(A).  Nevertheless, the court is persuaded by the reasoning of the court in In re Acushnet River that at least one component of natural resource damages -- the diminution in value of those natural resources pending restoration -- is legal in nature.  It amounts to compensating the plaintiff for injury to its property, much like damages recovered in nuisance or trespass -- both classic legal causes of action.  See In re Acushnet River, 712 F. Supp. at 999.

Even assuming that the other components of natural resource damages are equitable in nature, as Wade suggests, Viking and Chambers' Seventh Amendment right to a jury trial is triggered by this one legal component of the remedy.  Cf. Dairy Queen, Inc. v. Wood, 82 S. Ct. 894, 896 (1962) (explaining that the right to a jury trial is not "lost as to legal issues where those issues are

characterized as 'incidental' to equitable issues"). Also, because this component of the natural resource damage remedy is legal, it renders other underlying factual issues legal in nature such that they must be tried to the jury, even if they are also relevant to equitable components of the remedy. As Wright and Miller explain:

> [T]he constitutionally required solution in the situation in which a single issue may be either legal or equitable depending upon the remedy awarded is to have a jury present to decide the issue, even though the district court then may have to determine for itself, on the basis of the jury's determination, whether to grant relief of a type that was historically viewed as equitable.

9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2306, at 129 (3d ed. 2008).

In this case, before Viking and/or Chambers can be held liable for any of OPA's remedies, including the legal component of the natural resource damage remedy, the government must prove that (1) Viking and/or Chambers are "responsible part[ies]" (2) for the "facility" (3) from which oil was discharged (4) "into or upon the navigable waters or adjoining shorelines." 33 U.S.C. § 2701(a). Therefore, any factual questions associated with these elements of liability now become legal issues and must also be tried to the jury. Cf. Moore v. Sun Oil Co. of Pa., 636 F.2d 154, 156 (6th Cir. 1980) ("Since Moore's claim for legal relief and equitable relief are both based on alleged racial discrimination . . . he was entitled to have a jury determine liability (i.e. whether he had been a victim of racial discrimination).").

Because the factual issues related to liability and at least one component of natural resource damages must be tried to a jury before any equitable issues can be decided, the court concludes that judicial efficiency would be best promoted by ordering that the entire case be tried to a jury. For those issues that are equitable in nature, and therefore not triable of right by a jury, the jury's verdict will be only advisory.[82]   See Fed. R. Civ. P. 39(c). Accordingly, the court denies the United States' Motion to Strike Jury Demand of Defendants.

### V.   Viking and Chambers' Motion to Bifurcate Trial

Viking and Chambers request that the court order separate trials for the determination of liability and damages pursuant to Federal Rule of Civil Procedure 42(b). Rule 42(b) provides that the court may order separate trials for separate issues or claims "[f]or convenience, to avoid prejudice, or to expedite and economize . . . ." Fed. R. Civ. P. 42(b). The court concludes that bifurcated trials would not achieve these ends in this case.

"When ordering a separate trial, the court must preserve any federal right to a jury trial." Id. The court has concluded that

---

[82]The use of the advisory jury will promote judicial efficiency by requiring the litigants to present their full case only once. See In re Acushnet River, 712 F. Supp. at 1007. Moreover, in the event the court deems a particular jury finding only advisory because it has concluded that the underlying issue is equitable, and the issue is later determined to be legal, and thus triable to the jury by right, a retrial will be unnecessary. See id.

Viking and Chambers have a constitutional right to a jury trial for factual issues related to liability and at least one component of natural resource damages.  Therefore, if the court were to order separate proceedings for liability and damages, a separate jury would be required for each.  The court is not persuaded that this would be convenient or that it would expedite or economize the litigation of this action.  Accordingly, the court will deny Viking and Chambers' motion to bifurcate.

### VI.  <u>Conclusion and Order</u>

Based on the foregoing analysis, Defendants', Viking Resources, Inc. and Roger W. Chambers, Joint Motion for Final Summary Judgment (Docket Entry No. 20) is **DENIED**, and Plaintiff United States' Motion for Summary Judgment (Docket Entry No. 22) is **DENIED**.  Plaintiff United States' Motion to Correct a Material Inaccuracy in Defendant Viking Resources, Inc.'s Response to Plaintiff's Motion for Summary Judgment (Docket Entry No. 28) is **DENIED as moot**.  Plaintiff United States' Motion to Strike Jury Demand of Defendants (Docket Entry No. 33) is **DENIED**, and Defendants', Viking Resources, Inc. and Roger W. Chambers, Unopposed Motion to Bifurcate Trial (Docket Entry No. 35) is **DENIED**.

In order to prevail at trial, the United States must prove that Viking and/or Chambers are (1) "responsible part[ies]" (2) for the "facility," i.e., the old tank battery, (3) from which oil was

discharged (4) "into or upon the navigable waters or adjoining shorelines" and (5) that the discharge resulted in "removal costs and damages." 33 U.S.C. § 2702(a). The United States also must prove the amount of removal costs and damages that may be recovered in accordance with the applicable provisions of the OPA.

Viking and Chambers have raised several affirmative defenses. They will bear the burden to prove the elements of those defenses at trial.

**SIGNED** at Houston, Texas, on this 11th day of February, 2009.

_____

SIM LAKE

UNITED STATES DISTRICT JUDGE